My name is Elizabeth Brown and I'm an attorney at Heller-Urman. I represent the appellant Eric Dannenberg at this appointed pro bono counsel. I would like to at this time reserve two minutes for rebuttal. There are two principal issues before the Court today. The first, whether the district court erred in finding that the defendants did not violate Mr. Dannenberg's First Amendment right when they refused to deliver his subscription magazines once he was transferred to the reception center at the Wasco prison facility. And then the second principal issue is whether the district court erred in finding that Mr. Dannenberg's right to his magazines was not clearly established at the time of the deprivation. Turning to the first issue, and Mr. Dannenberg posits that the district court erred in both respects. Turning to the first issue, the district court made some fundamental errors in applying the standard that both parties agree applies, which is the Turner v. Safley standard, which in its essence is a balancing test where the court balances four distinct factors in determining whether a policy that deprives a prisoner of his First Amendment rights is justified. Mr. Brown, are you aware of any case law in our circuit that existed at the relevant time here that it was unconstitutional for prison to enact a content-neutral ban on periodicals while the inmates are in the transitional reception center? Not anything specifically on point that relates to a transitional center, but it is clearly established by circuit law that a blanket deprivation of the First Amendment right is That's not really what we're talking about here. This is a prisoner who was in a transitional center and he didn't know how long he was going to be there. Apparently there are some administrative issues, perhaps some cost issues, which we can talk about later, that the prison is raising. It's not that they're trying to deprive him of his material, it's that when people come and go, you get a bunch of mail piling up and you have to trace it where the prisoners are going, they don't feel it's reasonable. I think there's two things I'd like to say in response to that. And the first is that the undisputed fact is that prisoners in the transition, in the reception center are there for, on average, 60 to 90 days. And we would posit that that is not a short-term deprivation of a First Amendment right. Mr. Dannenberg himself was actually there for four months. And he, in his declaration, submitted that he knew of at least other reception center inmates who had been there for five months. So the first point is that that, by virtue of the fact of being in the reception center, doesn't mean that deprivation is short-term. The second issue is that the policy at issue isn't rational because the prisoners were still receiving the regular mail, they were still receiving, they were entitled to subscribe to a single book per month, all of these different things that were allowed to be processed and delivered to them. Let's work backward. What about the prison news case? That says that the prisoners just generally, whether they're in the transitional area or not, do not have a right to bulk mail. Do you agree with that? I think that Morrison v. Hall establishes that there needs to be, that there needs to be a rational basis in terms of deciding whether a particular category of mail can be just blanket. And granted that, I just want to work backwards with you. Right. But do you agree that our case law says that prison officials have the right, commensurate with First Amendment rights, to ban bulk mail for inmates? Isn't that what that case says? I don't recall it standing for that specific proposition that bulk mail could be completely, inmates could be completely deprived of bulk mail. But I would say that in Morrison v. Hall, the Court recognized that subscription publications should be treated more akin to personal mail. So what we're talking about here — And there's no issue here, is there, counsel? If your client were in a specific long-term holding cell, nobody's saying that he couldn't get Time or Newsweek or Sports Illustrated or Playboy or Playgirl or whatever he wants. Maybe the latter may be the problem. I don't know. But in any event, there's no problem about that, is there? No, that's not the issue before the Court. So the issue really is, here's somebody in a transitional center. Nobody really knows how long he's going to be there. Once he gets to a specific place he's going to be for a longer time, there's no problem with the mail. This is an administrative problem. They're not trying to deprive him of his First Amendment rights. It's an administrative problem. Do you agree with that? I don't agree with that, because to buy that argument, it has to be agreed that the deprivation here, that somehow it's justified by the length of time. Is an administrative problem a sufficient reason to deprive you of First Amendment rights? The case law, again, going back to the Turner text — I mean, everything's an administrative problem to the government. Right. And I think the Turner factors have to be balanced against each other. So even if we were to assume that an administrative problem is a legitimate interest, here that's not exactly what the State posited at the summary judgment stage. They said that the purpose of the policy was to conserve prison resources, which conflates the Turner factors. The first prong only — Well, it was basically money, wasn't it? It was costing too much money to give people their rights. Exactly. And the magistrates said their financial estimates were grossly exaggerated. That's correct. They basically conflated the two of the prongs of Turner. The first prong, which is to establish that there was a legitimate interest at stake and that the policy was rationally related to it. And a third prong, which deals specifically with the issue of cost. And here they tried to put forward that cost alone entitles a deprivation. And the other important factor here is that the second prong that shouldn't be overlooked in the Turner test, which is whether the prisoner had alternatives available to exercising his First Amendment right. And here the district court found that there was a material dispute of fact on that point and did not then take the next step, which is required on summary judgment, which is to find that fact established as a matter of law for the appellant, Mr. Dannenberg. And the same case was found. Ms. Brownlee, I know your time is short, and I'm going to intrude on it. Perhaps Judge Reiner will give you two minutes extra if I intrude. But for me, the key question is how specific has this constitutional right got to be? And I understand your answer to Judge Smith. There isn't a very specific case on this. But do you have any case giving us guidance as to how specific in general the constitutional right has to be to sustain an action of this kind? I think on the particular facts here, the Court can look to Crofton v. Roe, which is a Ninth Circuit authority. I'm sorry. Your turn. Crofton v. Roe, which is Ninth Circuit authority, where the Ninth Circuit found prior to the actions involved in this case, this was in 1999, that a policy preventing inmates from receiving a particular category of mail, and that was Internet-generated mail. So it was like here, a particular category that was being determined that the ---- Well, I'm looking for some generic guidance as to how specific a case has to be in order to establish a constitutional right. You don't offer us anything on that point, do you? It is a fact-intensive inquiry, but that the general proposition here that this is a blanket deprivation, which the Ninth Circuit disfavors generally of such a right, and the idea that you can define a category of First Amendment material and just, based on that ---- I'm trying to ask you a question that comes up all the time and that is very difficult to answer, and it comes up in the AEDPA cases also. When is it a clearly established right for AEDPA? When is it for qualified immunity? I think there's a difference between the two. But how do you know when you tell somebody, look, you've got a right to get magazines and they come in and say, ah-ha, but you didn't say we have a right to do it in Omaha, but we didn't say you have a right to do it under these circumstances. What do you need for a case to say the right to receive it in this prison is established enough so that a reasonable prison official would know you can't deprive somebody of First Amendment rights because it costs you $5,000, $10,000, $100,000? What level do you have to have established for purposes of qualified immunity? Now, tell us Crofton tells you you've got a right to get this material and it gives you the test you apply, the four factors. Is that enough for somebody who says he's in a short-term facility? You don't have a case that you have a right to receive it in a short-term facility. Is it enough to say it's sufficiently established to say you have a right to get it and here are the four factors? Does that give them enough knowledge so that they can be held liable? Or do you need to have a case in which they've actually deprived the prisoner of the right in a short-term facility? I think looking to guidance elsewhere is the idea that there have been other instances where the deprivation has been of comparable length and the length of that deprivation was not ñ it wasn't necessarily involving a reception center facility or a transitory facility, but pretrial detainees. In your brief, you give, I think, three cases, three or four cases, all out-of-circuit cases in which you say these are short-term places. Do you think those cases establish your right? Okay. Or are you relying on Crofton and the general test? Crofton v. Roe provides the categorical that it's not to identify a particular category of materials and deny that to the prisoner. But the out-of-circuit authority, I believe it's Green v. Farrell, Mann v. Smith, and Jacklevich v. Simmons, two of those cases were in the Fifth Circuit. And I believe Jacklevich v. Simmons is the Seventh Circuit, where the prisoners were deprived of their rights for a particular length of time. In Green v. Farrell, it was ten days for a pretrial detainee, 75 days for convicted felons. And on those facts that that's how long the inmates were deprived or incarcerated at the institution, they were still found to be a First Amendment violation by denying those prisoners their magazines and newspapers. What's your position on House v. Bond with the Fourth Circuit case, where you had a transitional center almost on all fours with this case, and the Court found that no First Amendment right was denied? Well, I would disagree that it's on all fours. This situation is on all fours with Housa. First of all, in Housa, the only the appellant or the plaintiff there conceded that the government had advanced a legitimate interest. And here we're saying that cost alone can't be a legitimate penological interest. But probably the most important distinction between Housa and this case is that there were alternatives available. There were newspapers that were made available to the inmates. And here we're talking about, again, a blanket deprivation. There was no alternatives available to Mr. Dannenberg. And that should weigh, I think, fairly more heavily in the analysis than the district court gave it credit. And then the third thing was in Housa, there was no evidence. And I think really what the Court relied on, there was no evidence in the record that any of these inmates who were there temporarily, and in that case it was only 55 days, we're talking about a longer deprivation, twice as long of a deprivation as to Mr. Dannenberg. But they didn't know at the time. I mean, Mr. Dannenberg didn't know how long he was going to be there, right? Neither did the prison officials. Right. But they do know that on average it's 60 to 90 days. But that in Housa, there was no evidence. I'm sorry. We're running way over. What was the most important distinction you were going to say? Then we have to stop. Okay. The most important was the lack of available alternatives here as opposed to in Housa. And second, that here there is actual evidence that during the time that Mr. Dannenberg was there, he would receive his magazines. Because, in fact, he did receive his magazines. He received his first magazine within the first week of having transferred there. And that was actually delivered to him because he wasn't at that point in the reception center. But after he moved to the reception center, he continued to receive magazines during the length of time that he was there. In Housa, the plaintiff did not submit any evidence to suggest that it would have been feasible to receive any magazines during the length of time of the incarceration. So I think on those points. All right. We'll give you two minutes to rebuttal. Thank you. You might be thinking about this. Is this moot? If your client actually got the magazines, why are we here? He did not get the magazines. I thought you said he did. No. Well, they arrived at the prison. They weren't delivered to him. So I think in Housa, it was the court determined that it was unlikely that the plaintiff had not submitted any evidence to suggest that during the length of time he would have received any magazines had they been allowed. And here in Dannenberg's case, we know that the magazines made it to the prison in time that he could have received it while he was there. But the fact of the matter is they just were not delivered to him. Well, just to follow up on this question, the injunction is moot, isn't it? The injunctive belief we concede is moot. But you're also seeking damages? Yes. Okay. All right. Thank you, counsel. Good morning, Your Honors. May it please the Court, my name is April Hiroshima-Gatling, and I represent defendant prison officials. I'm from the Attorney General's office. The district court's judgment should be affirmed for two reasons in this case. Under Turner v. Safely, Wasco State Prison and Reception Center's policy did not impermissibly infringe on Mr. Dannenberg's First Amendment right. Secondly, if in fact you find that the policy did infringe on Mr. Dannenberg's right, the prison officials are entitled to qualified immunity, as it was not clearly established that a non-content-based temporary interruption in the receipt of magazine subscriptions by transitory reception center inmates violates the First Amendment. All four Turner factors weigh in the defendant prison officials' favor. Judge Smith hit it right on the head, and this is a common-sense evaluation here. It is not disputed that Mr. Dannenberg received his magazines before and after he was in the transitory, transitionary stage. The only dispute is the small period of time when he was actually in transition. As I said, all four factors of the Turner test weigh in defendants' favor. The policy is rationally related to a legitimate governmental interest in light of the fact that all the inmates at Wasco Reception Center are transitory. Wasco Reception Center processes around 20,000 inmates a year. That amounts to about 1,600 inmates a month and 76 inmates a day that are transferred out. I don't know that this is in the record, so it may be an improper question, so you can tell me if that's the case. Is there any evidence in the record that suggests how long it takes to get a subscription changed? Like, for example, Time magazine. My own personal experience is that if you move and you send in a request to change your subscription, it takes about six weeks to change it. I don't know whether there's anything in the record on this, but if you postulate that that's the case, would it not be rather impractical for those kinds of magazines to be switched around in a transitional center? Absolutely. And it would be a huge administrative burden on the system. What's the huge administrative burden? Your Honor, Wasco State Prison is different than or Wasco Reception Center is different than other institutions in that all inmates that come through that center, in the transition center, eventually leave. Therefore, all mail and magazine subscriptions, magazine subscriptions come on a regular basis, arguably weekly, such as Newsweek, bimonthly or monthly, must be forwarded on to their new location. Inmates do not know their new location until they're actually transferred out of the transition center. And like Judge Smith said, sometimes it can take up to six weeks. So magazines must be forwarded for that period of time. It's very impractical. Aren't there two questions whether they have to be forwarded? Maybe you don't have to forward them. But what is the cost of distributing them if they do arrive when the person is at the prison? Well, the policy itself precludes. What? The policy itself precludes. No, I asked what is the cost? Well, in our declaration in the record, we have a declaration from Mr. Trevino, who is an individual knowledgeable in prison finances. And he estimates approximately $300,000. That's on the assumption that every one of the 5,000 inmates in the reception center. That's kind of a preposterous assumption, isn't it? Excuse me? He said that's kind of a preposterous assumption. No, Your Honor. I don't think so. If Mr. ---- Well, it's disputed anyway. Dahlenberg disputes it. He disputes it. So it's a disputed fact. No, Your Honor. Why? It's not. It is evidence that was before the Court. And it is not ---- It's what? It is not a determinative evaluation. But it is a disputed fact. That's what I'm asking you. Is it not disputed? The actual cost of the magazines and boarding is disputed. Is it? Well, that answer to me should have been it is a disputed fact. Yes. However, the increase ---- So don't say it's $300,000. It's a disputed question. Yes. The actual ---- All right. Well, let's be clear. Your Honor, the actual cost is disputed. However, what is undisputed is that an administrative burden and increasing cost will occur. And that is a material ---- Well, any ---- well, what is it? We don't know. What is the burden? Some burden. Almost anything in this world, if you do something different, there's a little bit of a burden. That is correct. But these inmates in transitory centers, it is impractical for them. They're there from 60 to 90 days. Well, why did you make the argument about the forwarding? I don't understand. That's the question here. Is this the distribution while in the facility? Excuse me. Can you repeat that? You made an argument that it would be a problem forwarding them. Yes, that's correct. But that isn't the question raised here. The question is about distribution in the facility. Yes. But the policy does not allow for distribution in the facility. So any magazines ---- No, but why did you make an argument about forwarding? Because that is the administrative burden. If magazines are received ---- That wasn't the issue here. The issue was distribution. Correct. All right. Thank you. Your Honor. And, you know, the idea that every inmate is a subscriber to magazines, maybe that's why the magistrate said that your figures were so grossly exaggerated. Yes, but I believe that if ---- But, you know, what's wrong with the policy, if it takes a long time to get it, what's wrong with the policy of letting people who are subscribers receive what they've already subscribed to so that you don't have new subscribers? Well, the difference with ---- We do not believe our numbers are unreasonable. Do you have any idea how many of the people who come in come in as subscribers? No, Your Honor, because the policy precludes those hard numbers, availability of those hard numbers. And we do not believe that our numbers are grossly exaggerated. As counsel states, if Mr. Gannonburg can be taken as an example, as a typical inmate, he had nine separate subscriptions. And is he a typical inmate? Is that the typical? No. We can see that he is the very ---- he is atypical. He certainly is. Yes, he is. But, you know, that's the whole problem for you, is you've got a lot of speculation. You believe this, you believe that, and there hasn't been ---- you've got it on summary judgment, where you have to concede everything to decide your opposing. You can't come in here with your facts. You've got to concede all the facts of the appellant. Yes, that's correct. So your proper answer on what's the cost was Mr. Gannonburg's cost, not the $300,000. But Mr. Gannonburg does concede that there would be an increase in cost. I know. But when I asked you that question, what's the cost, you should not have given the State's answer. You should have given his answer, because that you conceded when you go up here on qualified immunity. This has happened before, and I've written another opinion saying when the Attorney General does that, he risks his whole case, because you only get this appeal on qualified immunity if you concede. You understand that? Yes, Your Honor. Well, then don't make up facts from your side. Ultimately, counsel, as you're hearing from my colleagues, this gets down to something of a, pardon me, a practical consideration. You've got a prison budget of around, as I understand, about $88 million. Somebody's used a $300,000 figure this morning. What I thought the record showed was a $200,000 figure. So I'm not sure what that is. There is a dispute on that number. But the reality is if you took Mr. Gannonburg's proposal, you're talking about if it were a $200,000 cost and if every inmate, based upon the figures that we have, were there, it would be .23% of 1% of the total prison budget to take all of the descriptions and forward all of them. Is that an unreasonable burden for the prison to bear? Yes, when you consider that there are approximately around 160,000 inmates in the CDCR's custody currently, and they're all processed through about nine reception centers. So to ask each reception center to incur that 2% to 3% increase, it is an administrative burden on the system, Your Honor. I'd like to ask you, following up on Judge Reinhart's question, this, of course, is a case involving qualified immunity in part. Yes. And the question here is whether Mr. Candelaria was, whether the law was sufficiently clear at the time this occurred that he would have known that he was violating this prisoner's constitutional rights. The opposing counsel has suggested that, at least implied, that he certainly should have, because Taylor and other tests were there. What's your response to that? I do not believe that the law was clearly established in this area for transitory inmates in a reception center. This is a non-content-based policy. It's a temporary interruption in magazine subscriptions. And as you mentioned, the House v. Vought case, the Fourth Circuit case that the district court relied on heavily to be on all fours with this case would lead a prison, a reasonable prison official to believe that their actions were reasonable. In the House case, the ---- How can you answer that question without knowing what the cost is? If your basic problem is the cost, suppose I told you you could do this for $1 a year. Would you then still have qualified immunity? If there was ---- It's valid in the specific context of the case. No, in this case. Everything in this case. If it was just $1 a year, Your Honor, it would not be a significant administrative burden. All right. So the only way you can tell whether you had ---- whether you knew and had qualified immunity is to determine what the cost is and whether that's a real burden. I don't believe so. I don't think that the cost alone is determinative. What are the other factors? The other factors is that there were alternatives. He had other alternatives available to him. And ---- What were they? Your Honor, there ---- Mr. Danenberg concedes that he ---- there was television available to him. A library cart came through with softcover books. He's also allowed to order softcover books. Just because Mr. Danenberg argues that he was not interested in the type of material that was offered does not negate the fact that there were alternatives. How do books tell you what a news magazine tells you? Excuse me? How do books tell you what's going on in the world today? The policy does not, under Morrill v. Arpaio, the policy does not have to be a perfect fit. It just, the prison officials, it has to, the policy has to be rationally related to a legitimate governmental interest. But the interest here is in current information about the state of the world. Books don't do the trick. And so it's not an alternative way. That is true. There is television available, Your Honor, that is available in the prison cells as well. I don't know about television. Do you get Fox News? I'm not sure, Your Honor. Are newspapers available? I believe, I actually am unsure if newspapers are. I believe in the prison law library there are newspapers available, but I don't believe it's actually in the record as such. So. It sounds from what you're saying like this is a good case to go to trial rather than to have summary judgment. I don't believe so, Your Honor. Wrapping up, as I said, this is a temporary, non-content-based policy, and it's a temporary interruption of magazine subscriptions. It is reasonably related to a legitimate governmental interest in the administrative burden that would be on the system, and the law was not clearly established at the time that would alert a prison official that his actions were unconstitutional. I was pleased to know in this case that Judge Reinhart thinks that the weekly news magazines tell what's going on in the world. Thank you, Your Honors. I was talking about the New Yorker. May it please the Court, I'll just make a couple of brief points in rebuttal. The first is that, and it is, and I couldn't find the specific record site, but the policy does prohibit the inmates from receiving newspapers, and I just wanted to address. Let me just ask you this. Maybe you know what you did not know. I wanted to know, they talked about a cart going through a library cart. Are newspapers available on that? It certainly is not in the fact record if they are. In fact, Mr. Dannenberg indicated that the cart contained only books and he was only able to check out. In fact, the cart was only made available twice to him during his stay at the reception center, so it certainly wouldn't have been news on a daily basis. But I think the law in the Ninth Circuit is clear, Morrison versus Hall, that TV and radio are not adequate substitutes for print media, either newspapers or magazines, and the same would be that books are also not an adequate substitute. And I think it's also the defendants have raised the issue of this administrative burden, and really what Mr. Dannenberg is only requesting is that they do an incremental more amount of what they already do. He's not asking for a complete upheaval in how they administer the mail services. They already process magazines for the mainline prisoners who are there, the same mail room. They already review mail. In terms of an administrative burden, they're only being asked to do an incremental amount more of what they already do. But in this case, as you discussed with Judge Reinhart, you're not asking for the adjunction anymore. He now has his magazines. What you're looking for is damages against the prison official. Is that right? He doesn't have his magazines from the time that he was – he never received the magazines. You don't really want those magazines now, do you? No, but I think he would like the restitution for the magazines. I assume he'd really like to establish the principle. I think – and one final point is that on qualified immunity, you only get to the second – there are two prongs. And the first is to determine whether there was a violation of the First Amendment rights. And you only get to the second prong of whether that right was clearly established after determining that first step as to whether there was a deprivation here. Let me ask you, because of Judge Smith's question about what you're really interested in, which is something I wonder about in a lot of these cases. You could get damages if you got qualified immunity. Otherwise, that doesn't get you anything else particularly. If you got the first determination that it's a constitutional violation, you would get everything but damages, wouldn't you? Well, I think, as we've stated, we don't – we believe that the law was clearly established at the time so that he would actually get his damages. I'm not – no, no. I understand, in theory. But I'm asking practically what you're interested in receiving out of this case, because I have a suggestion otherwise. You would establish the principle if you won on the first prong. If you won on the second prong, you would establish a slightly further principle, which is that the law – and you would establish the law for the future. If you won on qualified immunity, you'd establish the law as of an earlier period, and you'd be able to get damages. What I was wondering was, if you were principally interested in just establishing the principle, whether you and the attorney general's office might not settle this case. We have a mediation service, and I wondered whether you were both interested in going there and seeing if you could agree on a solution that would make you both happy. I assume the attorney general might not be unwilling to talk about whether the principle could be established for the future, since they might have a pretty good idea that it will be. And Judge Reinhart may have a copy of the magazines that your client is missing. Could I follow up that by saying, if you think about what the damages would be, can you imagine the jury giving more than a dollar of damages? I can't. Well, I think he's established, or putting to the record, the dollar value of the magazines was over $200 that he had lost in that description. Well, if you could settle it, I should think you might waive the $200. I would have to check with my client. Well, I know the attorney general will have to be consoled, too. But it's the sort of thing that cries out for settlement. As long as you're able in the settlement to get the principle established somehow, either in a, in coming to the court with a stipulation of some kind or something like that. But unless either of you object, which you certainly have a right to do, we can refer this case and hold a decision. We can refer it to mediation. And at any time you don't, you change your mind and don't want to go, all you do is say we no longer have any interest. The mediator doesn't tell us who objects, who doesn't. They just say we can't resolve the case. Do either of you have any objection to that? Well, just call Jerry Brown and tell him it's a good idea. Okay. The appellant has no objection to that. Okay. Well, we'll wait to hear from the attorney general. Thank you. And we'll delay submission until we hear from you. If we hear that you don't want to go to mediation, then we'll submit the case. If we hear you do, we'll refer it and hope we won't see you again, but maybe we will.
judges: Reinhardt, Noonan, M. Smith